UNITED STATES *v.* AMERICAN WHALING CO., INC. (No. 4659) [1]

United States Court of Customs and Patent Appeals, March 30, 1951

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.
*Jerome G. Clifford* for appellee.

[Oral argument February 7, 1951, by Mr. Donohue and Mr. Clifford]

[1] C. A. D. 454.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal by the United States from a judgment of the United States Customs Court, Third Division, C. D. 1256, sustaining appellee's protest and directing the collector to reliquidate the entry and refund all duties taken upon the repairs incurred by appellee on the floating whaling factory *Frango* at the port of Sandefjord, Norway, under the provisions of section 466 of the Tariff Act of 1930.

Section 466, *supra*, reads as follows:

The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

Appellant contends that the *Frango* was engaged in the foreign trade, with the requisite governmental permission needed for such undertaking, and that the *Frango* was intended to be employed in such foreign trade and therefore was subject to the provisions of section 466, *supra*.

The evidence discloses that the *Frango* originally was a tanker which was purchased by appellee and converted into a vessel specially equipped for the specific purpose of engaging in the whale fishery business. Its equipment included special machinery and apparatus with which to process the captured whales, and tanks in which to store the merchantable whale oil, and for such purpose the *Frango* carried certificates of registry.

It was the custom to have the *Frango* repaired and overhauled at Sandefjord, Norway, where a crew of Scandinavians would be signed on for each voyage, only the officers of the crew being citizens of the United States, and then the *Frango* would proceed to the West Australian whale fishing grounds.

The captured whales would be processed and the oil placed in the tanks. Most of the crew would be sent to shore at Capetown, South Africa, and sent back to Sandefjord. Only a crew sufficient to man the vessel would be kept aboard. The *Frango* would then proceed to the United States where the whale oil would be disposed of. There-

after the *Frango* would proceed to Sandefjord for repairs and a general overhauling in preparation for the next whaling voyage and another Scandinavian crew would be signed on for the voyage.

Returning to the United States from one of such whaling voyages the *Frango* arrived at the port of Baltimore, Maryland, in December, 1937, where all the whale oil produced on the voyage was discharged except 6 tons of damaged whale oil and 20 tons of sperm oil for which there was no market in the United States. The *Frango* then proceeded to New York where it took on 4,017 tons of whale oil for delivery at Manchester, England.

At the trial in the Customs Court eight exhibits were introduced in evidence. Collective Exhibit 1 consists of the shipper's export declaration of 4,017 tons of whale oil from New York to Manchester, England, the oath of the master of the *Frango* on clearance of the vessel from the port of New York, outward foreign manifests and affidavits. Collective Exhibit 2 pertains to the entrance and clearance papers of the *Frango* at the port of Baltimore. Collective Exhibit 3 is the certificate of registry of the *Frango*. Collective Exhibit 4 is a copy of a declaration of the master as to repairs made upon the *Frango*. Exhibit 6 is the ownership oath on registry of the *Frango*, dated December 22, 1937, the registry being listed as "Temporary." Exhibit 7 is a record of the *Frango* which lists the service as "Whale Fisheries." Exhibit 8 is a record of foreign clearances of December 24, 1937, which shows that the *Frango* was cleared for Manchester, England and Sandefjord, Norway.

Clifford N. Carver, who was vice president and operating manager of appellee testified that all the stock of appellee corporation was owned by American citizens; that the corporation was engaged in the business of producing whale oil; that his father was president of the corporation in December, 1937, and January, 1938; that his father died in 1948 about one year before testimony in this case was taken; that his father executed the ownership oath upon which the documentation for the particular voyage here involved was issued; that he "received the form, which my father had signed, and, with the captain, went over to the Customs House to the Customs authorities and asked for clearance of the ship on this voyage, the details of which we had already discussed in Washington with Captain Sweet * * *"; that the voyage referred to was to Manchester, England, to Sandefjord, Norway, and thence to the whaling grounds; that Johannes Smith who was master of the *Frango* executed the master's oath and that the documentation which was issued was based on the above referred to ownership and master's oaths and based on the voyage which would start in New York, then to Manchester, England, Sandefjord, Norway,

the whaling grounds off West Australia, and back to the United States; that Collective Exhibit 3 was issued "to the *Frango* on the strength, of the application and information" he gave to the collector's office.

Collective Exhibit 3 contains the certificate of registry which shows, it to be "Temporary," and designates the service as "Whale Fisheries."

Title 46, Section 672a (b), U. S. C. reads:

From and after six months after June 25, 1936, upon each departure of any such vessel from a port of the United States, 75 per centum of the crew, excluding licensed officers, shall be citizens of the United States, native-born, or completely naturalized, unless the Commandant of the Coast Guard shall, upon investigation, ascertain that qualified citizen seamen are not available, when, under such conditions, he may reduce the above percentages.

The evidence discloses that prior to the issuance of the certificate of registry here involved the question about the crew was discussed with the government authorities in Washington as to whether or not the whaling crew which was on board the *Frango* could be returned to Sandefjord on that ship, or whether the *Frango* had the right to carry the cargo for someone else, plus the whaling crew, on the papers the *Frango* had, and it was agreed in Washington that that was permissible. The documentation for the voyage here involved was issued with that knowledge. The members of the foreign crew then on board were issued lifeboat men's certificates and able-bodied seamen's certificates although they were not citizens of the United States, and the *Frango* was authorized to sail from the port of New York with the above mentioned crew.

Evidently the government authorities at the port of New York did not consider that the *Frango* was engaged in or intended to engage in, foreign trade, because the vessel was cleared and permitted to sail with its Scandinavian crew, none of which were citizens of the United States. Vessels engaged in the whale fishery are not required to have a crew, or any percentage of a crew, composed of citizens of the United States.

Dominick Manfredi who was employed in the Marine Division of the Collector's Office of the Port of New York testified as follows:

Q. I show you Plaintiff's Exhibit 5 and direct your attention, if you please, to the words, "To correct authority for documenting vessel." Did you receive any authority for documenting this vessel?

A. Evidently there must have been authority received from either the home port or the Bureau, Department of Commerce, in Washington. We have no evidence on file.

Q. Have you produced any such document, if you have any?

A. We haven't any in our office.

Q. Would that authority be by way of a letter or a telegram?

A. It may be by wire, by telephone or by letter.

Q. Your office has no records of how the authority originated, which is referred to in Plaintiff's Exhibit 5, has it?

A. That's right, sir.

Q. Do you have any knowledge of your own as to what the authority was for documenting this vessel, or the change of the document?

A. No, sir.

James P. Kennedy testified that he was employed in the Monies and Accounts Division, Customs Bureau of the Treasury Department; that all records of the dates here involved had been destroyed and that he was unable to determine whether or not the *Frango* paid any tonnage tax.

Johannes Smith testified that he was master of the *Frango*; that it carried no passengers; that on the involved voyage he had a Lieutenant Midtlyng, a Coast Guard Officer, on board; that Lieutenant Midtlyng was picked up in Portland, England, on the way out to the whaling grounds; that he remained on board until the *Frango* arrived at New York and that Lieutenant Midtlyng was on board pursuant to an international agreement; that the crew was paid wages and a bonus on the amount of whale oil produced on the voyage.

George A. O'Shea testified that he was the assistant Administrative Officer in charge of the Entrance and Clearing Section, Marine Division, Customhouse, at the Port of New York in December, 1937; that on or about December 24, 1937, he issued the clearance papers for the *Frango* to clear from New York and proceed to the ports of Manchester, England and Sandefjord, Norway.

The *Frango*, under the documentation referred to, returned to New York from the involved voyage and the collector assessed a duty 50 per centum ad valorem under the provisions of section 466, *supra*, upon the costs of certain repairs to the *Frango* which were incurred during the general overhauling made at Sandefjord, Norway, on the voyage on which it carried the whale oil from New York to Manchester.

In its brief appellant, referring to the decision of the Customs Court, states:

* * * it is held that a vessel documented for the whale fishery was documented to engage in foreign trade; that there was a wide difference between documentation and the undertaking, as in the case at bar, to deliver a cargo of oil; that a vessel documented to engage in the fishery was permitted (46 U. S. C. 310) to engage in foreign trade when the master obtained permission from the Collector for that purpose, and that such permission does not change the documentation of the vessel * * *. The statements are true, but the error of the court was in the conclusion drawn therefrom that Section 466 imposed a duty only on repairs made to vessels documented to engage in foreign trade. The second category— those intended to be employed in such trade—expressly described in the statute, was overlooked by the Customs Court at this point in the discussion.

The evidence plainly shows that the *Frango* was documented for the whale fishery; that its owners were desirous of carrying one cargo of whale oil from New York to Manchester; that the authorities in Washington and New York were consulted and that permission to carry the cargo was granted; that the clearance papers were issued for the *Frango* to clear for Manchester, England and Sandefjord, Norway, where the usual customary repairs and overhauling were had for the purpose of making the *Frango* ready for the next whaling trip.

The Government contends that the *Frango* left New York on the voyage here involved as a cargo carrier and that the *Frango* was intended to be employed in foreign trade when it cleared from New York, and thereafter changed its intended purpose and proceeded to engage in the whale fishery.

We think the evidence shows that the *Frango* left New York with the intention of engaging in the whale fishery, with the permission of the Government to carry the cargo of oil to Manchester on its way to Sandefjord for repairs and overhauling.

The evidence does not show that any repairs were occasioned by reason of carrying the cargo of whale oil to England.

The statutes do not provide for any duty to be assessed upon the cost of equipment and repairs incurred in a foreign port by a vessel documented under the laws of the United States to be employed in the whale fishery.

In *United States* v. *Western Operating Corp.*, 35 C. C. P. A. (Customs) 71, C. A. D. 373, we said:

It clearly appears that the foreign trade and the whale fishery, from a legal standpoint and otherwise, are essentially different employments, and that the intention of Congress down through the years has been that the employment of vessels should be indicated by the documents possessed by them.

Prior to the enactment of section 280, a register was the lawful documentation for a vessel engaged in the foreign trade, and an enrollment and license was the lawful documentation for a vessel engaged in the whale fishery. Section 280, however, made a register a lawful documentation under the laws of the United States for a vessel engaged in the whale fishery.

The exception thereby provided in favor of such a vessel, and the possession by her of a register for the purpose of engaging in the whale fishery, did not, however, "*ipso facto*" establish her right to engage in foreign trade, but, on the contrary, established only her right to engage in the whale fishery. * * *

Upon the record we do not think the *Frango* was engaged in or intended to engage in foreign trade.

For the reasons stated the judgment of the United States Customs Court is *affirmed*.

Worley, J. dissents.